UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| Reid C., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 19 CV 50101 |
| | ) | Magistrate Judge Lisa A. Jensen |
| Andrew Marshall Saul, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

This case is again before this Court after a ruling by the administrative law judge who has denied, now for a second time, Plaintiff's application for Social Security disability benefits.

Plaintiff, who is 44 years old, has struggled with anxiety and alcohol for many years. He has only worked sporadically, in a few jobs and then for only short periods; he has had trouble finding stable housing, living on the streets periodically and in a homeless shelter for longer periods; and he has had rocky relationships with a series of girlfriends. In 2011, on a cold winter night, his girlfriend locked him out of the apartment. He got frostbite in both feet, which turned into gangrene and led to the partial amputation of his right foot. Eventually, he received a housing subsidy through the Rosecrance Shelter Plus Care program which helped him somewhat. His father has played a pivotal support role over the years by texting or calling him almost every day and by coming to town every two to three weeks to check on him, meet with his counselors, and take him to the grocery store and laundromat. As for the alcohol problem, Plaintiff has gone on drinking binges where he would consume 24 beers in a night, but he has also had periods of abstinence, in turn followed by more relapses. He has gone to the emergency room numerous times, often after drinking heavily. On the positive side, he has written several novels that were

1

self-published. Although Plaintiff does have a few physical problems, it is the intertwined problems of alcohol and anxiety that are at the forefront of this now long-running case. Plaintiff believes that his inability to sustain concentration is the primary obstacle preventing him from staying employed.

To recap the procedural highlights, Plaintiff filed a Title II application in 2013. In November 2015, an ALJ held a hearing at which psychologist Allen Heinemann testified. In January 2016, the ALJ ruled that Plaintiff could do sedentary work subject to various restrictions (*e.g.* doing only simple routine tasks). The ALJ noted that Plaintiff's abuse of alcohol often played a role in his problems. The ALJ also relied on the fact that Plaintiff wrote several novels to buttress the conclusion that Plaintiff could concentrate. The ALJ rejected the opinion of Dr. Shahina Jafry, a treating psychiatrist, faulting her for not acknowledging the alcohol problem. *See* R. 25 ("Notably, Dr. Jafry made no mention of alcohol dependence in her opinion, despite consistently listing the impairment as [a] diagnosis in the treatment records[.]").

After exhausting administrative appeals, Plaintiff filed an appeal in this Court. In June 2018, Judge Johnston remanded the case mainly because the ALJ did not provide a clear analysis of the alcohol problem. *Reid C. v. Berryhill*, 17-CV-50074, 2018 WL 3105954 (N.D. Ill. June 25, 2018).[1] As Judge Johnston explained, by statute, a claimant cannot be found disabled "if alcoholism or drug addiction would . . . be a contributing factor material" to the decision. *Id.* at \*2. Under SSR 13-2p and Seventh Circuit case law, an ALJ must determine whether the claimant would still be found disabled "if he or she stopped using drugs or alcohol." *Id.* Judge Johnston found that it was unclear whether the ALJ had conducted this materiality analysis. Although the ALJ did not explicitly say that she was discounting symptoms because they were caused by

---

[1] *Reid C.* provides additional background information that will not be re-summarized here.

alcohol, the ALJ still repeatedly "cited to the alcohol problem in a way to suggest that it was the hidden rationale doing most of the heavy analytical lifting." *Id.* Judge Johnston was concerned that the ALJ downplayed the many emergency room visits by treating them as if they were merely caused by Plaintiff's voluntarily decision to overindulge. Judge Johnston referred to the ALJ's overall approach as a "*de facto* materiality analysis."[2] *Id.*

On remand, the same ALJ held a new hearing on February 5, 2019. Psychologist Michael Carney testified as the impartial medical expert. Like Dr. Heinemann before him, Dr. Carney agreed that Plaintiff had moderate problems with concentration. He mentioned the novel writing and alcohol problem several times in his analysis. A couple of weeks later, the ALJ issued her ruling, again finding that Plaintiff could do sedentary work subject to restrictions. The ALJ relied on largely the same evidence and rationales. Parts of the ALJ decision, including much of the paragraph B analysis, are verbatim copies from the first decision. At the end of the opinion, however, the ALJ added a section addressing the issues raised by Judge Johnston. Stylistically, the opinion retains the same basic shell as the first one, except with some additional factual material being added about the medical history, especially events since the last ruling, and with a new bit of analysis being tacked on the end, like adding a few more train cars to the back of a long train that continues to rumble down the same track.

## STANDARD OF REVIEW

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C.

---

[2] Although the ALJ's ambiguity regarding the alcohol question was the central reason for the remand, Judge Johnston noted three other issues. First, the ALJ did not apply the checklist under the treating physician rule. *Id.* at *4. Second, the ALJ inferred that Plaintiff had a general aversion to work because he did not work before his alleged onset date in 2013, but the ALJ did not consider that Plaintiff's mental impairments "started fifteen years earlier" and were "present during his entire adult working life." *Id.* Third, the ALJ placed too much weight on the novel writing. *Id.*

§ 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. *Id.* Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Accordingly, the reviewing court is not to "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner." *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019).

However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (a "mere scintilla" is not substantial evidence). A reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Moreover, federal courts cannot build a logical bridge on behalf of the ALJ. *See Mason v. Colvin*, No. 13 C 2993, 2014 WL 5475480, at *5-7 (N.D. Ill. Oct. 29, 2014).

## DISCUSSION

Plaintiff again raises multiple arguments for remand. Although these arguments are slightly re-formulated from the first appeal, the overall thrust is the same because, as Plaintiff notes, "many of the same themes present in the first ALJ hearing and decision reoccur in this second ALJ hearing and decision." Dkt. 19 at 1. There is indeed a large overlap, and unfortunately this Court finds that the same concerns prompting the first remand are still unresolved. Two issues stand out.

**I.      The Alcohol Question**

It makes sense to start with this issue because it is the main reason for the first remand. As stated earlier, the factual history portion of the second decision is similar to the first decision, at least up until 2016. But the ALJ did add the following two-paragraph explanation at the end of the decision to address the specific issue of alcohol:

> The District Court indicated that the previous decision had not addressed the claimant's "many breakdowns" over a decade in relation to the effects of the claimant's alcohol abuse on his ability to function. Since the application date of May 21, 2013, the claimant's "breakdowns" amount to five emergency room visitations, with only one resulting in admission in September 2013. Even emergency room visitations prior to the application date revealed a similar pattern of not taking medications, attempting to self- medicate with alcohol, followed by a worsening of symptomatology. A number of emergency room visitations with only one resulting in extended hospitalization does not reflect a history of breakdowns.
>
> The analysis of these breakdowns also answers the District Court's concerns regarding the materiality of alcohol abuse in this claim. Throughout the medical evidence of record, the claimant's condition has exclusively been dependent on compliance with treatment and prescribed medications. While it is true that the claimant was abusing alcohol during his emergency room visitations, he had also been off medications for some time at this point. During periods of compliance with medications, the claimant was sometimes noted to have engaged in alcohol abuse, but was not observed as reporting suicidal ideation or any worsening of symptoms. As such, even when the claimant's condition was at its worst, it was not a direct result of his alcohol abuse, but instead his failure to follow prescribed treatment. It is therefore not material to a finding of disabled in this claim.

R. 1591 (internal citations omitted). To summarize, the ALJ indicated that she was *not* discounting evidence based on a *de facto* materiality analysis and that she believed that the better explanation for Plaintiff's breakdowns was his failure to take his medications. In short, the ALJ offered a non-compliance rationale.

There are two basic problems with this new rationale. The first is that it was not previously emphasized in the long history of this case. Instead, the ALJ and two experts played up the role of alcohol. As Plaintiff notes, they "[r]epeatedly [] discounted evidence in support of

5

Plaintiff's limitations *because* Plaintiff used alcohol." Dkt. 19 at 13 (emphasis added). This Court agrees.

Judge Johnston drew the same conclusion in *Reid C.* He analyzed various statements from the ALJ's decision and concluded that the ALJ framed that discussion in a way to highlight the alcohol issue. We need not re-visit Judge Johnston's analysis, except to note that the ALJ's decision contains some of the same statements, including a verbatim replay of one of the sentences Judge Johnston analyzed.[3] This raises a question as to whether the ALJ truly looked at the evidentiary record with Judge Johnston's concerns in mind or whether the ALJ basically just stuck with the same approach. In the new parts of the ALJ's factual summary, she continued to emphasize the role of alcohol. Consider, for example, the following sentence: "On June 3, 2016, the claimant reported that even after losing his toes related to drinking, he was still drawn to the allure of it." R. 1588. These statements suggest that the ALJ's underlying thinking was the same despite the inclusion of the new rationale.

At the second hearing, both the ALJ and Dr. Carney repeatedly invoked the alcohol problem at critical points when the evidence appeared favorable to Plaintiff. *See* R. 1652 (ALJ: "[A]s I pointed out, there was one [therapy program] you never completed *because of your drinking* and you wanted to get back in and they did not put you back in.") (emphasis added); R. 1659 (ALJ: "And you were still drinking at that time."). The ALJ also clearly believed that Plaintiff was lying and covering up his drinking. The ALJ's very first questions to Plaintiff related to a recent fire in Plaintiff's apartment. Plaintiff explained that he had "different groceries, boxes on top of the stove for several weeks and apparently something sparked, and it

---

[3] *Cf.* R. 23 (first opinion: "However, these records indicate that the claimant was abusing alcohol during a substantial portion of this period.") *with* R. 1587 (second opinion: "However, these records indicate that the claimant was abusing alcohol during a substantial portion of this period.").

lit one of the boxes." R. 1613. Plaintiff stated that he was asleep when the fire started, but the ALJ doubted this explanation, as revealed in this exchange:

> Q [by the ALJ] Were you drinking on that occasion [*i.e.* when the fire started]?
>
> A No, I was not.
>
> Q But despite telling me last time that you were sober, it looks like you had several, at least, relapses, if not continuous drinking since the last time I saw you. In September when you went to the hospital, you told them you were drinking every day.
>
> A That would be—
>
> Q When did you start drinking again?

*Id.* The questioning goes on in a similar vein from here, with the ALJ continuing to pick at Plaintiff's veracity. *See, e.g.*, R. 1614 ( "I find it hard to understand why you would make up such a story like that. Particularly if you were not drinking.").

Dr. Carney's testimony was not as clear-cut or dogmatic (he never suggested Plaintiff was lying), but he still made statements along the same lines. For example, when counsel asked about Plaintiff's hospitalizations, he seemed to dismiss this evidence, stating: "That was for alcoholism though." R. 1653. Plaintiff's counsel asked him a series of questions about the causal relationship between the alcohol and anxiety. Dr. Carney's basic answer was that he "not sure how to answer" that question. R. 1650. At one point, he vaguely stated that the anxiety was "kind of occurring with" the alcohol. R. 1648. But he never made an adequate effort to disentangle the two conditions, as required by the Seventh Circuit. *See Harlin v. Astrue*, 424 Fed. Appx. 564, 568 (7th Cir. 2011).

But there was one topic on which Dr. Carney offered a more definitive statement about the alcohol use. The ALJ asked him to "distinguish" Dr. Jafry's October 7, 2015 opinion letter stating that she believed that the "pervasive and chronic natures of [Plaintiff's] symptoms"

7

would prevent him from working. R. 1561. Dr. Carney distinguished this opinion by first noting that it was submitted three years ago and then by stating:

> [Dr. Jafry] didn't mention at all that alcohol was going to be kind of the most [salient] issue with the Claimant basically. You know, that's the struggle that he has particularly prior to that time because I looked at his record from 2012, where he had, you know, numerous hospitalizations for alcoholism. So, that's what I found kind of surprising about that, that she did know that kind of fairly brief summary, then didn't mention that at all.

R. 1645-46. Dr. Carney's statement that Plaintiff's hospitalizations were "for alcoholism" again suggests he was discounting that evidence. But the larger point is that he was criticizing Dr. Jafry for not giving more prominence to the alcohol abuse even though the ALJ later, at the end of the second opinion, agreed that the alcohol abuse was not the main problem.

The above statements provide evidence, albeit indirect evidence, that the ALJ was still conducting a *de facto* materiality analysis. But even if this concern were put to the side, there is a separate problem with the ALJ's newly emphasized rationale. The ALJ never explored *why* Plaintiff was unable to take his medications consistently. *See Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) ("Although a history of sporadic treatment or the failure to follow a treatment plan can undermine a claimant's credibility, an ALJ must first explore the claimant's reasons for lack of medical care before drawing a negative inference"). Specifically, the ALJ never considered the fairly obvious possibility that Plaintiff's mental impairments made it difficult for him to remember to take his medications and seek re-fills, etc. *See Spiva v. Astrue*, 628 F.3d 346, 351 (7th Cir. 2010) ("The administrative law judge's reference to Spiva's failing to take his medications ignores one of the most serious problems in the treatment of mental illness—the difficulty of keeping patients on their medications."); *see also Kangail v. Barnhart*, 454 F.3d 627, 629 (7th Cir. 2006) ("bipolar disorder can precipitate substance abuse, for example

8

as a means by which the sufferer tries to alleviate her symptoms"). In *Jelinek*, the Seventh Circuit explained:

> The ALJ apparently concluded that Jelinek's symptoms would have remained under control but for an unwillingness to take her medications as directed. But we have often observed that bipolar disorder, one of Jelinek's chief impairments, is by nature episodic and admits to regular fluctuations even under proper treatment. ALJs assessing claimants with bipolar disorder must consider possible alternative explanations before concluding that non-compliance with medication supports an adverse credibility inference.

*Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2011).

The ALJ failed to explore these possibilities and apparently assumed that Plaintiff could easily comply if he wanted to. But as the Seventh Circuit cases emphasize, it is not easy for a person with bipolar disorder in particular to consistently take a series of multiple medications. At the first hearing, Dr. Heinemann testified that Plaintiff's concentration problems were present "even with the multiple medications that he's receiving." R. 70. This testimony cuts against the ALJ's conclusion. To the extent that the ALJ wishes to rely on this rationale on remand, more work should be done to develop the facts and to explore these issues.

## II.     Concentration and Novel Writing

One thing is not in dispute. Plaintiff is "smart," as Dr. Carney acknowledged. R. 1657. No one has suggested he lacks the intellectual ability to do the simple tasks under consideration. The issue is whether he could stay on task. Dr. Heinemann nicely summarized this issue:

> [Plaintiff's] main limitations have to do with sustaining attention and concentration for an extended period staying on task for an entire shift. While I don't think he's limited to any kind of mental demands in terms of complexity of the task it's sustained attention and concentration.

R. 72. One of Plaintiff's major arguments is that the ALJ failed to adequately analyze this important question. The argument has several parts. Plaintiff first argues that the ALJ overlooked evidence, particularly from his father. He next argues that the ALJ gave too much weight to the

9

novel writing. Finally, he argues that the ALJ did not explain why no "off task" limitation was included in the RFC. The Court finds that these arguments, particularly the first two, provide an additional basis for remand.

The first two arguments rest on the broader assertion that the ALJ downplayed contrary lines of evidence. *See Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012) (ALJs cannot ignore contrary lines of evidence). One line of evidence came from Plaintiff's father. He testified at the second hearing and provided a lengthy letter in the first round of administrative proceedings. In both instances, he discussed Plaintiff's day-to-day struggles in concrete and sometimes vivid terms. In the letter, he gave the following overview:

> Reid's anxiety manifested itself in many ways. He had trouble concentrating when he worked and could not do things he had done before like go to the movies, fly in a plane (in fact he boarded a plane to go to Texas and had to get off before it left because he was having an anxiety attack), cross certain bridges, ride on public transportation like buses or trains and ride in a car as a passenger for long periods without suffering a panic attack.

R. 309. At the second hearing, he gave the following example to illustrate Plaintiff's concentration problem: "If you were to ask him, for instance, to put a band on a watch he would not be able to do that. I mean he just couldn't concentrate. He'd become very frustrated." R. 1632. Plaintiff's father was an important witness in another respect. He confirmed parts of Plaintiff's testimony that the ALJ questioned. However, the ALJ ignored this evidence for the most part. Although the ALJ briefly noted that Plaintiff's father had testified, the ALJ did not summarize the details of his testimony and certainly did not give it any weight. The letter was not considered at all. This evidence should have been considered.

Turning next to the novels, it is clear, first of all, that great weight was placed on this factor. It was mentioned multiple times. An argument can be made that it was the only evidence

10

on this issue. At a minimum, it was a key piece of evidence, and was not simply one brick in a much larger evidentiary wall such that it could be overlooked under a harmless error analysis.

Plaintiff argues that the ALJ relied on a superficial factual picture and made assumptions about what is involved in writing a novel. Judge Johnson expressed similar concerns in *Reid C.*. He noted that the "ALJ did not give any consideration to Plaintiff's explanation that he wrote these novels as a 'kind of outlet' for his anxiety and that he did so on his own schedule for about ten hours a week." *Reid C.*, 2018 WL 3105954 at *4. He also noted, relying on Seventh Circuit case law, that "it is a much different task to work consistently for a 40-hour week as opposed to doing more sporadic activities that can be flexibly scheduled around good periods." *Id*.

As for the facts, the ALJ relied on the same few facts from the first decision. Specifically, the ALJ noted that Plaintiff "published several books and was currently working on another" and that he "spends up to ten hours a week writing." R. 1583. But this description is incomplete because it fails consider contrary evidence from multiple sources.

This evidence includes Plaintiff's testimony At the first hearing, he did testify that he spent approximately ten hours a week writing, which the ALJ noted, but he further testified: "I have a tough time reading on a consistent basis because my ability to concentrate is very poor, and that's why [] I'll work on my book ten hours a week, but that doesn't mean I'm going to get a whole lot written. A lot of the time it's just kind of staring at the screen trying to gather my thoughts which has been an issue." R. 63-64. At the second hearing, he testified that he last finished a novel "almost two years ago" and that he had written "two books in the last six years." R. 1642, 1643. Plaintiff also made statements to doctors and examiners along the same lines. *See, e.g.*, R. 2168 (Dr. Peggau: "[Plaintiff] enjoys sports and he is an avid author working on his

11

sixth novel at present, he said. He gets them published for free and distribution is difficult but he has sold a few of them over the years."). The ALJ gave no weight to this evidence.

The ALJ also did not consider the letter from Plaintiff's father that stated:

> During the time Reid lived on the streets, he wrote several novels which were published by Publish America. He used the computers at the Rockford Public Library to do his writing. Due to his psychological problems, it took him a long time to write these books. He might go for days without doing any writing because he could not concentrate due to anxiety or depression. He might write for an hour or two and then not be able to concentrate at all because of a panic attack. I helped him sell some of his books to friends and relatives but we basically sold the books at cost so he made no money from his writing.

R. 310. Nor did the ALJ consider this statement from Plaintiff's friend, Jeffrey Cottrell, who had known him since 2008:

> [Plaintiff's] ability to write has been hampered by his condition. He was an avid writer before the anxiety but of late has shied away due to being unable to sit still— another passion of his life that has been altered.

R. 316.

It is true that the two experts at the hearings ultimately concluded that Plaintiff's concentration problems were moderate and could be accommodated by the RFC limitations the ALJ later adopted. The fact that the ALJ relied on these two experts to "translate" the moderate concentration finding into a proposed RFC undermines to some extent Plaintiff's argument based on cases like *Crump v. Saul* , 932 F.3d 567, 570 (7th Cir. 2019), a case Plaintiff relies on heavily. *See* Dkt. 19 at 11. However, there are other broader concerns about the ALJ's reliance on these experts.

First, both experts made statements indicating that Plaintiff's concentration problem might be more serious, but then they changed those conclusions after the ALJ cross-examined them. Dr. Heinemann initially opined that Plaintiff's concentration problems were marked. It

12

was only after the ALJ basically argued with him that he reduced that finding to moderate. R. 70-71. The ALJ also persuaded Dr. Carney to soften his conclusions regarding the Paragraph C analysis. The Commissioner agrees that Dr. Carney "revised his testimony" in response to the ALJ's questioning, but rejects the implication that the ALJ improperly pressured him. Dkt. 28 at 5. These equivocations are not dispositive of course, but they contribute to the overall concern about the adequacy of the analysis.

Second, on the specific issue of novel writing, both experts alluded to some of the same counter-arguments Plaintiff now makes. Dr. Heinemann observed that Plaintiff's writing was "not at a competitive level" because he was able to "take adequate work breaks" while writing. R. 72. Dr. Carney stated: "And for concentration, pace and persistence, again, I—you know, I—he did write two—I mean, *seems to me* writing a book takes a lot of concentration and focus. *I think he might say well, he's done it over a longer period of time*." R. 1643 (emphasis added). But the ALJ did not follow up on these concerns and further develop the record.

Third, these experts did not indicate whether they had considered all the contrary evidence cited above showing that Plaintiff's writing was not done in a regular and consistent manner that would be translatable into doing the same simple task over and over again.

In sum, the Court agrees with Plaintiff's argument that the ALJ and the two testifying experts relied too much on "speculation" about Plaintiff's writing. *See* Dkt. 19 at 12 ("Neither of them asked Plaintiff about how much time he spends writing, whether or not his books have been successful, what the length of his books are, what the topics of his books are, where he writes them, or how [his] anxiety impacts his ability to write books."). Plaintiff's counsel effectively highlighted these concerns in the following exchange with Dr. Heinemann:

> Q  [] my question, Doctor, would be given the long standing histories of anxiety for which he's treated for six years now in, I would argue, extensive treatment, he's

13

> received extensive treatment for this anxiety, my question to you is would Mr. [C] be off task in the work force due to break-through anxiety or panic attacks?
>
> A  That's—it's kind of hard to answer that—I don't think so, Counsel, on the basis of the record here. I mean he has panic attacks. He doesn't have panic attacks. I'm not quite sure of the frequency those would be, but it doesn't mean he would have them kind of constantly all day necessarily.
>
> Q  But if he has one—
>
> A  If he's able to write books, so he's able to focus and concentrate at various points in time.
>
> Q  Does the file reflect how many hours he spends writing books?
>
> A  No.
>
> Q  Does the file reflect whether or not his books are New York Times Best Sellers?
>
> A  I don't believe they are.
>
> Q  Okay. Does the file reflect who the publisher is of the books?
>
> A  I think it said it's self-publishing.
>
> Q  Okay. So, would it be fair to say that's different than being picked up by Barnum Publishing or—I don't know any of these other publishers.
>
> A  Oh, yeah, of course. Of course.
>
> Q  Okay. And so, is the writing of the books and the college education, the underlying intelligence, the major reason why you found—
>
> A  No. No, it isn't. But he's able to focus. That's why I'm kind of talking about the books and the ability to kind of focus and concentrate.

R. 1660-61. In the ensuing exchange, Dr. Heinemann did not go on to identify any other concrete evidence. Thus, contrary to his denial, Plaintiff's novel writing was a "major reason" for his conclusion. Reading the ALJ's opinion, with its repeated references to novel writing, leads to a similar conclusion.

One question not adequately explored is whether Plaintiff's writing was an episodic activity tied to the unpredictable ups and downs of his bipolar disorder. Here is how he described the variability of his symptoms:

> I think the most frustrating thing about the anxiety is the ebbs and flows that I go through every single day. Again, it can go hour-by-hour where I feel great—well, not great, but I feel okay one minute and then I can go into a total—almost a shell when I start having an anxiety or panic attack, or just like underlying anxiety where I'm just shaky. I mean I'm constantly shaky all the time, even when things are going okay and I'm just sitting, trying to sit still, reading a book or watching a television show.

R. 1629-30.[4] The ALJ and Dr. Heinemann presumably believed that a person writing a novel sits down and writes regularly every day for a set amount of time without losing focus. Perhaps this is true for some, but history contains many famous counter-examples of people who, despite mental illnesses or alcohol problems that incapacitated them for significant periods, were still able to write books or produce other types of writing (William Faulkner, Hunter S. Thompson, Dylan Thomas, Theodore Kaczynski, to cite a few well-known examples).

The Court acknowledges that the ALJ did specifically address this topic at the end of the opinion, stating as follows:

> In the Order provided by the Northern District Court of Illinois, the undersigned was asked to give further analysis to the claimant's history as a writer. At the time of the previous decision, the claimant had written five books; as of the date of this decision, he has reportedly written six, with his seventh awaiting publication. It was suggested in the Order that the claimant's writing potentially served as an "outlet" for his anxiety. However, throughout the progress notes from Rosecrance Ware Center, there is no suggestion that this is the case. It is likely that if his writing were seen as a coping activity that could help assuage his anxiety, it would have likely been brought up by his examining sources. Furthermore, whether or not his writing served as an outlet to his anxiety does not alter proof of how this activity reflects that the claimant has a higher ability to concentrate and persist than alleged.

---

[4] Dr. Peggau's report includes a similar statement from Plaintiff: "I get really high, like a lot of adrenaline going, and clean my apartment and run around full of energy and other times I can't even get out of bed." R. 2167.

15

R. 1590-91. But this explanation does not address the above concerns. The ALJ did not respond to Judge Johnston's specific point that Plaintiff could write "on his own schedule." The ALJ also did not consider the contrary facts from Plaintiff's father and others, nor develop the record further by eliciting details about the manner and frequency of Plaintiff's writing. Ultimately, the ALJ's explanation is mostly a re-assertion of her previous conclusion. But stating that conclusion again, without providing a deeper analysis, does not resolve the concerns raised by Plaintiff and Judge Johnston.

### III.  Additional Considerations

The two issues above are sufficient to order a remand. The Court will briefly note a few other issues deserving attention on remand. First, as discussed above, the ALJ at the hearing repeatedly stated flat out that she thought Plaintiff was lying about his drinking and other matters. In her written decision, she pointed out many instances in which he missed doctor's appointments, suggesting he was unreliable in some general sense.[5] These statements give the impression that the ALJ believed that Plaintiff was malingering. Yet, at the same time, the ALJ never clearly indicated in the written decision that she thought Plaintiff was malingering or even that he was untruthful, thus raising a question about how the ALJ resolved this issue and specifically whether it operated as a hidden rationale. To the extent that the ALJ thought Plaintiff was lying, this would not necessarily end the analysis because it is possible that this problem was caused by, and therefore evidence of, his mental impairments. *See Spiva*, 628 F.3d at 351 ("Spiva's being vague or evasive when questioned about his illness could be evidence of malingering, but equally could reflect the effects of his psychotic mentation."). Dr. Carney

---

[5] *See, e.g.* R. 1588 ("It was noted that he had difficulties attending all scheduled appointments due to forgetting and lack of transportation[.]"; R. 1589 ("On December 11, 2018, it was noted that while the claimant had reported missing an appointment due to a family funeral, his father stated that there was none.").

16

alluded to this issue, stating: "[Plaintiff's therapists] did mention borderline personality disorder and there is a kind of question of manipulation that kind of goes on there, which is consistent with a personality disorder." R. 1640. This issue should be addressed more directly on remand.

Second, possibly related to this previous point, the ALJ did not acknowledge or investigate Plaintiff's apparently turbulent social history. The consultative psychologists—John Peggau and Mark Langgut—both described a series of incidents where Plaintiff had conflicts with others. *See* R. 2168 (Dr. Peggau: "[Plaintiff] had a 2001 DUI and seven or eight additional arrests for battery and fist fighting as well as telephone harassment and disorderly conduct. The last time was 2014 when, 'I got into a fist fight with my buddy and they arrested me'."); R. 1297 (Dr. Langgut: "The claimant has been arrested for telephone harassment. He also has been arrested three times for battery of three ex-girlfriends, all of which were alcohol-related. He received one DUI in 2001."). Likewise, Dr. Carney testified: "I think [listing] 12.08 is also implicated. There is aggressive outbursts. He had several, I think, domestic violence charges against himself." R. 1640. The ALJ overlooked this evidence. Maybe there is a valid reason why, but it should have at least been acknowledged. It would seem to be particularly relevant to the "interacting with others" part of the paragraph B analysis.

Third, the ALJ referred several times to Plaintiff having applied for work. *See, e.g.*, R. 1588 ("he had begun to look for work" and was "applying to jobs online"). Although it is hard to gauge how much weight was given to this issue, the ALJ's repeated references to it suggest some weight was given to it. But what is missing from the analysis is an explanation why mere attempts to look for work, which repeatedly turned out to be unsuccessful, are evidence that Plaintiff could work. One could argue that these failed efforts support the opposite conclusion.

17

Fourth, the ALJ again rejected Dr. Jafry's opinion, but the rationale was somewhat different. The ALJ did not mention Dr. Jafry's failure to mention the alcohol problem. The ALJ's new rationale was that Dr. Jafry only saw Plaintiff "once in April 2014" and was therefore not a treating physician but only a "one-time examining source." R. 1592. But this factual claim seems to be wrong. Although Plaintiff did not raise this point, the Court's review of the record uncovered evidence that Dr. Jafry saw Plaintiff many times. *See, e.g.,* R. 1506, 1507, 1508 (this is only a partial list).

There are other issues and topics we have not discussed, such as Plaintiff's taking of college courses at one point and his brief work at a local laundromat. These issues, and all other relevant issues, should of course be considered in a comprehensive analysis on remand. The Court acknowledges that these issues, in particular the task of trying to disentangle the effects of alcohol, are not easy to resolve. However, given that this case has already been considered twice by the same ALJ, the Court strongly recommends that a new ALJ be assigned to the case on remand to ensure that the full record can be considered with a fresh eye.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is granted, the Commissioner's motion is denied, and this case is reversed and remanded for further consideration.

Date: November 17, 2020        By: _____
                                   Lisa A. Jensen
                                   United States Magistrate Judge